## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **DARCY G. ARNOLD,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:20-cv-01804** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **PNC BANK, N.A.,** | : | **Magistrate Judge Chelsey M. Vascura** |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter comes before the Court on the Motion for Summary Judgment of Defendant PNC Bank, N.A., on all claims and counterclaims (ECF No. 93). For the reasons set forth below, this Court **GRANTS** the Motion for Summary Judgment on Plaintiffs' declaratory judgment, undue influence, tortious interference, and breach of contract claims (Counts I, II, III, and V) and **DENIES** the motion on Plaintiffs' breach of fiduciary duty, breach of trust, and accounting claims (Counts IV, VI, and VII) and Defendant's declaratory judgment counterclaim.

### I.  BACKGROUND

#### A.  Factual Background

In 2016, Jack Richardson made changes to his estate. The changes, referenced by the parties as the "2016 Amendment," replaced his only daughter, Plaintiff Darcy G. Arnold, as successor trustee and executor of his will with Defendant PNC Bank, N.A. ("PNC" or "PNC Bank"); the changes also delayed the timing and altered the manner of disbursements from Richardson's trust to Arnold and his granddaughters, Plaintiffs Ashley N. Pennington and Angela M. DeNoble. Plaintiffs believe that these changes were made at the behest of PNC Bank,

1

as part of a concerted effort by PNC to target elderly clients and hoard assets and fees. Defendant, on the other hand, maintains that Richardson personally asked for, directed, and understood the changes to his estate. The disagreement about the true rationale for Jack Richardson's decision to change his trust is at the heart of this case.

1. *Creation and Initial Amendments to Trust and Will*

In 2003, Jack Richardson executed a will and accompanying trust (the "Trust") with the help of attorney Richard Burke. (*See* Pls.' Second Am. Compl., Ex. A, ECF No. 56-1). Under the terms of the Trust, Jack and his wife, Betty, were named co-trustees. (*Id.* at 1). Upon Jack's death, the Trust would be split into a "Marital Trust" and a "Family Trust," each of which would provide income to Betty. (*Id.* at 2–3). Richardson amended the trust in 2007 and 2011. (*See* Exs. B & D, ECF No. 56-2, -4). The 2011 Amendment changed the successor trustee from PNC Bank to his daughter, Arnold, and adjusted the final distribution of the trust, such that half of the trust would go to Arnold and one quarter to each granddaughter upon the deaths of the Richardsons. (Ex. D, ECF No. 56-4 at 1–4). Richardson also amended his will at this time, replacing PNC with Arnold as executor. (*See* Am. Pls.' Resp. in Opp'n to Def.'s Mot. Summ. J., Ex. G ("First Codicil"), ECF No. 97-7).

These documents were prepared by a new attorney, David Humphrey, because, according to Plaintiffs, Richardson had fired his previous attorney. (*See* ECF No. 97 at 4). Richardson certainly did have an unexplained issue with Burke on July 12, 2011, ten days after Burke had already transferred all documents from his Richardson file to Humphrey. (*See* Deposition of Richard Burke ("Burke Dep."), Ex. 42, ECF No. 91-1 at 19–20; Deposition of Kimberly Mason ("Mason Dep."), Ex. 4, ECF No. 90-1 at 9). A PNC email two weeks later notes that "[Jack] now has changed his mind and does not want to use this attorney. . . . He has now fired this

2

attorney," but the email mentions only David Humphrey by name and does not reference Burke. (Mason Dep, Ex. 5, ECF No. 90-1 at 10). Burke himself claimed that Richardson stopped working with him and switched to Humphrey, who is based in Columbus, when the Richardsons moved to Columbus. (Burke Dep. 14:15–15:6, ECF No. 91).

## 2. *The 2016 Amendment*

Richardson's health declined in the years after the 2011 Amendment. (*See* Def.'s Mot. Summ. J. at 4, ECF No. 93; ECF No. 97 at 12). Richardson suffered from anxiety and depression, partly stemming from the fact that his wife, Betty, had been afflicted by Alzheimer's disease.[1] (*See, e.g.*, Ex. J, ECF No. 97-10). The anxiety and depression manifested at times as moments of "angry and negative attitude," which sometimes required medication. (Ex. K, ECF No. 97-11). Nurses at the Richardsons' living facility, Feridean Commons, noted that Jack occasionally appeared "confused and forgetful." (Ex. N, ECF No. 97-12; *see also* Ex. R, ECF No. 97-18). Additionally, he had lingering issues involving his digestive tracts, stemming from surgery to treat colon cancer. (*See* ECF No. 97 at 13; ECF No. 93 at 4). The parties vigorously dispute the extent to which these health issues affected his cognitive functioning or sense of independence; Plaintiffs suggest that "he was mentally and physically unwell" (ECF No. 97 at 26), whereas Defendant points out that Richardson continued to read the newspaper every day,

---

[1] Defendant PNC Bank suggests that the medical records attached as exhibits to Plaintiffs' memorandum contra (ECF No. 97) are hearsay, and therefore cannot be considered by this Court in deciding Defendant's summary judgment motion. (*See id.* at 6 (citing *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (internal citations omitted); *Charles v. Air Enters., LLC*, 224 F. Supp. 3d 657, 661 (N.D. Ohio 2017) (internal quotations omitted)). Medical records may be admissible as an exception from the rule against hearsay as a business record "provided the party offering the records can meet the requirements set forth in Rule 803(6)." *Tucker v. Nelson*, 390 F. Supp. 3d 858, 863 (S.D. Ohio 2019). Rule 803(6) "specifically refers to the 'compilation, in any form, of . . . diagnoses, made at or near the time by . . . a person with knowledge, if kept in the course of a regularly conducted business activity . . . .'" *Id.* (quoting *Norton v. Colyer*, 828 F.2d 384, 386–87 (6th Cir. 1987)). Of course, one of the requirements is authentication "by the testimony of the custodian or another qualified witness, or by a certification," Fed. R. Evid. 803(6), which Plaintiffs have not provided. But this Court may provide a party with an opportunity to rectify that misstep: therefore, Plaintiffs have fourteen days from the entry of this Opinion & Order to authenticate the medical records. *See Thomas v. Harvey*, 381 F. App'x 542, 545–46 (6th Cir. 2010).

was able to recognize and took an interest in his great-grandchildren, and knew his progeny and their relationship to him. (*See* Deposition of Darcy G. Arnold ("Arnold Dep.") 66:24–67:22, ECF No. 88; Deposition of Angela M. DeNoble ("DeNoble Dep.") 40:12–41:21, ECF No. 85). Defendant also argues that the medical records provided by Plaintiffs do not establish health concerns contemporaneous with the execution of the 2016 Amendment, *see infra*, only issues in the years before and after 2016.

On June 8, 2016, DeAnn Riley, a wealth strategist at PNC Bank, and Kim Mason, a Senior Trust Adviser at PNC, met with Jack Richardson to discuss the Trust. (*See* Mason Dep., Ex. 19, ECF No. 90-3 at 11–12). Although PNC had been removed as the successor trustee in 2011, it continued to assist Richardson with his financial affairs and estate planning; the meeting in June had been pre-scheduled as part of PNC's semi-annual investment reviews with Richardson. (*Id.* 76:23–78:11, ECF No. 90). The same day,[2] Riley received an email from Doug Hicks, a vice president at PNC, who listed Richardson as a "$3+" client and wanted to know how Riley was planning to retain the accounts of these "$3+" clients after they died.[3] (Ex. A, ECF No. 97-1). PNC often recommended to such clients that PNC be put in place as the executor of the clients' wills and as trustee for the clients. (Deposition of Douglas Hicks ("Hicks Dep.") 38:25–39:9)., ECF No. 97-2). At the meeting with Mason and Riley, Richardson expressed concerns "that Darcy lived beyond her means" and that he "wanted to make sure that the assets that he and Betty had accumulated through their lifetimes was there for [Darcy's] retirement"

---

[2] Although Hicks' email was sent the day that Riley and Mason met with Jack Richardson, Plaintiffs characterize the Hicks email as the starting point of PNC's machinations. (*See* ECF No. 97 at 7 ("After Hicks' June 8, 2016 Email, PNC Bank immediately began to isolate the Richardsons from anyone who might find PNC Bank's actions suspicious. . . . For this reason, on June 8, 2016, that day after Hicks' email, Mason and Riley traveled to Columbus to meet with Jack.")). In fact, Riley and Mason had already been planning to meet with Richardson, and had discussed notes in preparation for the meeting the day before. (*See* Mason Dep. 79:1–11, ECF No. 90). Additionally, contrary to Plaintiffs' implication, June 8 is not the day after June 8.

[3] In this context, "$3+" indicates a client with over $3 million in net assets. (*See* Mason Dep. 80:22–81:4, ECF No. 90).

4

and for their granddaughters' retirements. (Mason Dep. 94:6–19, ECF No. 90; *see also* Deposition of DeAnn Riley ("Riley Dep.") 41:21–42:5, ECF No. 89). Because of this, Richardson wanted to change the mandatory distributions set out in the 2011 Amendment. (Riley Dep. 43:2–6, ECF No. 89). Richardson was also upset and worried that Arnold would not follow through with his wishes, because Arnold had obtained a power of attorney for Betty without Jack's permission in 2015. (Riley Dep. 44:2–12, ECF No. 89; *see also* Arnold Dep. 81:19–83:4, ECF No. 88). After the meeting, Sydney Landon, a caretaker at Feridean Commons, contacted Arnold and told her that Mason was "strongly encouraging [Richardson] to change Ashley + Angela's trust distribution to age 65," according to notes taken by Arnold after the call. (Affidavit of D. Arnold ("Arnold Aff.") ¶¶ 5–8, ECF No. 97-5; *see also id.* at 3).

Mason set out some options for amending the Trust, based on approaches that other PNC clients had taken. (*See* Riley Dep. 43:7–17, ECF No. 89). Burke, the attorney who had worked with Richardson until 2011, met with Richardson to discuss his desires and then, upon determining that he understood his options, drafted revisions to the estate planning documents according to the changes that Richardson had requested. (*Id.* 18:1–11). The parties dispute who hired Burke: Plaintiffs suggest that PNC unilaterally approached Burke without Richardson's permission based on an email from Mason to Burke asking to meet to discuss Richardson's desired changes to the Trust, whereas Mason testified that Richardson had asked her to reach out to Burke. (*See* Mason Dep. 89:13–16, ECF No. 90; Burke Dep., Ex. 47, ECF No. 91-1 at 29). PNC Bank was already familiar with Burke not only as Richardson's former attorney — he had represented several PNC clients and had also represented PNC in its fiduciary capacity of the estate of Burke's clients after they had passed away. (*Id.* 58:2–25, ECF No. 91; Hicks Dep. 44:9–45:17, ECF No. 97-2).

5

Richardson signed the 2016 Amendment in November. (*See* Ex. E, ECF No. 52-5). He reviewed the changes with Burke twice — once when he called Burke a week before signing and a second time on the day of for about 40 minutes. (*See* Burke Dep. 18:19–7, ECF No. 91). Burke confirmed that Richardson understood the revisions and affirmed that they matched his desires. (*Id.* 21:14–22:17, ECF No. 91). The 2016 Amendment made the following disputed changes to the Trust: (1) removing Arnold, Pennington, and DeNoble as successor trustees; (2) appointing PNC as the successor trustee; (3) creating separate trusts for Richardson's daughter, granddaughters, and any great-grandchildren, each of which would be "wholly discretionary"; (4) removing all mandatory principal distributions to Plaintiffs; (5) delaying mandatory income distributions to Arnold until age 65; and (6) delaying mandatory income distributions to the granddaughters, Pennington and DeNoble, by thirty-five (35) years.[4] (Ex. E, ECF No. 52-5 at 3–7, 12; *see also* Ohio Rev. Code § 5801.01(Y)).

Neither Richardson nor PNC Bank informed Arnold, DeNoble, or Pennington of the changes. In fact, Richardson had explicitly asked his contacts at PNC not to discuss the 2016 Amendment with his family. (Mason Dep. 122:11–17, ECF No. 90). Instead, Richardson asked Mason in 2017 to draft a letter explaining the changes to Arnold, who he was worried would put up a fight. (*Id.* 131:2–11). The letter itself does not mention the specific changes made to the estate in the 2016 Amendment, Richardson's concerns about Arnold's spending habits, or Arnold's decision to change Betty's power of attorney. (*Id.* 133:8–134:20). The letter was written by Mason, with revisions suggested by Richardson that Mason incorporated into a second

---

[4] Plaintiffs suggest that the 2016 Amendment "removed all mandatory distributions to Darcy, Angela, and Ashley." (ECF No. 97 at 9). That is not the case.

6

draft.[5] (*See id.* 132:14–18).  Although the letter was signed by Richardson, Plaintiffs dispute the fidelity of the letter to Richardson's own thoughts, in part because the sign-off of the letter read "Jack Richardson" rather than "your dad" or "your grandpa."  (Arnold Dep. 163:14–18, ECF No. 88; ECF No 97 at 10).

Richardson passed away in 2019, at which time PNC Bank succeeded him as trustee. Plaintiffs allege that, since then, PNC has disregarded the Trust provisions and prioritized its own interests over the interests of the Trust beneficiaries.  (*See* ECF No. 56 ¶¶ 44–49).  Although the 2016 Amendment dictated that Arnold would receive income distributions after turning 65, she has not received anything from the Trust in the last three years.  (*See* ECF No. 56-5 at 5; Arnold Aff. ¶¶ 3–4, ECF No. 97-5).  Nor has PNC transferred title to the Florida condominium owned by the Richardsons to Arnold, as required by the 2016 Amendment.  (*See* ECF No. 56-6 at 2–3).  This, to Plaintiffs, is further evidence that the 2016 Amendment was the result of a concerted plan of action by PNC Bank to target wealthy, elderly clients and retain their assets after the clients passed away, in contravention of the clients' true desires.  (*See* ECF No. 97 at 6).

### B.    Procedural Background

Plaintiffs Darcy G. Arnold, Angela M. DeNoble, Ashley N. Pennington, and Betty L. Richardson filed this action against Defendant PNC Bank, N.A., in the Delaware County Court of Common Pleas on March 10, 2020, alleging five causes of action.  (*See* ECF No. 1-1).  PNC removed the action to this Court based on diversity jurisdiction.  (*See* ECF No. 1).  After Betty L. Richardson passed away on January 17, 2021, Plaintiffs requested — and this Court granted — the substitution of Adam Rinehart, special administrator of Betty Richardson's estate, for her.

---

[5] Plaintiffs describe Mason as "PNC Bank's licensed attorney."  (*See, e.g.*, ECF No. 97 at 9).  Although Mason has a law degree, it is undisputed that she does not serve as an attorney or practice law at PNC.  (*See* Mason Dep. 21:12–14, ECF No. 90 (testifying that she works in a trust advisor role at PNC); *see also* Hicks Dep. 48:10–22, ECF No. 97-2 ("[I]f you're in any role at PNC on the wealth management team, you cannot practice law.")).

(*See* ECF Nos. 43, 44).  Rinehart is also the special administrator of Jack Richardson's estate.  In May 2020, Plaintiffs sought to join Kimberly Mason, the PNC Senior Trust Adviser and an Ohio resident (*see* ECF No. 18 at 5), as an additional defendant and, upon joinder, to remand the case back to state court for lack of diversity.  (*See generally id.*).  Over Plaintiffs' objections, this Court upheld the Magistrate Judge's recommendation that PNC's Motion to Deny Joinder (ECF No. 24) be granted and Plaintiffs' Motion to Remand (ECF No. 18) be denied.  (*See* ECF No. 32).  In so concluding, this Court concurred with the Magistrate Judge's finding that Plaintiffs sought to join Mason for the purpose of destroying federal jurisdiction.  (*See id.* at 3).  Thus, PNC Bank remains the sole defendant in this case.

Plaintiffs have twice amended their complaint.  The Second Amended Complaint alleges six causes of action: (1) declaratory judgment that the 2016 Amendment was the result of undue influence and therefore invalid and void; (2) undue influence; (3) tortious interference with expected inheritance; (4) breach of fiduciary duty; (5) breach of contract; (6) accounting; and (7) breach of trust.  (ECF No. 56 ¶¶ 54–118).  Defendant has filed a counterclaim, asking this Court for a declaratory judgment that Plaintiffs did not have "just cause" to remove PNC as trustee.  (Def.'s Countercl. ¶¶ 12–16, ECF No. 55).  On June 2, 2022, Defendant PNC Bank filed its Motion for Summary Judgment (ECF No. 93) on all claims and counterclaims.   That motion is now ripe for this Court's review.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party,

and draw all reasonable inferences in the non-movant's favor.  *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)).  But "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," the court must find that there is a "genuine" dispute of material fact and that summary judgment is inappropriate.  *Anderson*, 477 U.S. at 248.  Evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249–50.  Nor will "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position" be sufficient to overcome such a motion.  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

The initial burden rests upon the movant to present the Court with law and argument in support of its motion, and to identify the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (noting that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

### III.     LAW & ANALYSIS

### A.     Undue Influence

A claim of undue influence "descends upon a transaction '[w]here there is imbecility, or weakness of mind, arising from old age, sickness, intemperance, or other cause, and inadequacy of consideration; or where there is weakness of mind and circumstances of undue influence and advantage; in either case, a contract may be set aside in equity.'" *Carter v. LL&B Headwater II, LP*, 2017 WL 4270503, at *4 (S.D. Ohio Sept. 26, 2017) (quoting *Tracey v. Sacket*, 1 Ohio St. 54, 54 (Ohio 1852)). Under Ohio law, courts presume that a will admitted to probate was made free from restraint, *see Krischbaum v. Dillon*, 567 N.E.2d 1291, 1297 (Ohio 1991); *see also* Ohio Rev. Code § 2107.74, and contestants of the validity of the will bear the burden of proving undue influence, by showing: "(1) a susceptible testator; (2) another's opportunity to exert influence on the testator; (3) the fact of improper influence exerted or attempted; and (4) a result showing the effect of such influence." *Young v. Bellamy*, 2017-Ohio-2994, ¶ 19, 91 N.E.3d 172, 177 (Ohio Ct. App. 2017) (citing *West v. Henry*, 184 N.E.2d 200, 208 (Ohio 1962)). And they must do so by clear and convincing evidence. *See Simon v. Aulino*, 2020-Ohio-6962, ¶ 38, 165 N.E.3d 706, 718 (Ohio Ct. App. 2020).

As a threshold matter, Plaintiffs dispute their burden of proof, suggesting that "Ohio law does not require clear and convincing evidence, much less direct proof, of undue influence with respect to a will." (ECF No. 97 at 24 (citing *Simon*, 165 N.E.3d at 718–19)). While it is true that undue influence can be inferred from circumstantial evidence and does not require direct proof, *see Simon*, 165 N.E.3d at 718 (citing *Calloway v. Roy*, 1997 WL 200400, at *3 (Ohio Ct. App. Sept. 8, 1977)), the evidence adduced by the contestant must still meet the clear and convincing standard of proof for each of the four, above-mentioned prongs. *See id.* at 718; *see also Young v.*

10

*Kaufman*, 2017-Ohio-9015, ¶ 52, 101 N.E.3d 655, 670 (Ohio Ct. App. 2017); *Huntington v. Riversource*, 2015-Ohio-5600, ¶ 39, 45 N.E.3d 1053, 1059 (Ohio Ct. App. 2015). In arguing otherwise, Plaintiffs appear to conflate types of evidence (i.e., direct evidence or circumstantial evidence) with the standards of proof. Plaintiffs also suggest that "there is a rebuttable presumption that PNC Bank unduly influenced Jack into signing the 2016 Amendment" because "PNC Bank had a confidential, fiduciary relationship with the Richardsons." (ECF No. 97 at 25). Here, too, Plaintiffs have drawn the wrong conclusion from a correct premise. While "undue influence is presumed if the challenging party establishes that a fiduciary or confidential relationship existed between the decedent and a beneficiary," *Kaufman*, 101 N.E.3d at 671 (internal citations omitted), PNC is not a beneficiary of Richardson's estate. (*See* ECF No. 56-5; Def.'s Reply Mem. in Supp. of Mot. Summ. J., ECF No. 99 at 3). Therefore, the rebuttable presumption does not apply here.

*1.    Susceptibility*

In evaluating whether a testator was susceptible to influence, courts in Ohio have typically looked to the testator's personal characteristics and health. *See, e.g.*, *Lah v. Rogers*, 707 N.E.2d 1208, 1214 (Ohio Ct. App. 1998). In this case, PNC focuses its argument primarily on the former, noting that Richardson was a strong-willed, independent, and stubborn individual who prioritized saving money. (*See* ECF No. 93 at 9 (citing deposition testimony from Richardson's daughter, son-in-law, and granddaughters)). Plaintiffs emphasize the latter: they note that Richardson suffered from a panoply of health issues, which allegedly rendered him susceptible to undue influence. (*See* ECF No. 97 at 12–13). These concerns included moments of forgetfulness and confusion (though Arnold acknowledged that Richardson was still aware of the identity of his grandchildren and great-grandchildren, and his relationships to them),

depression, and gastrointestinal problems. (*See* Arnold Dep. 66:24–67:22, ECF No. 88; ECF No. 97 at 13).

Defendant suggests that "generic claims of health issues" related to old age are insufficient to establish susceptibility. (*See* ECF No. 99 at 7 (citing *Neumeyer v. Estate of Penick*, 180 Ohio App. 3d 654, ¶ 21, 2009-Ohio-321, 906 N.E.2d 1168, 1171–72 (Ohio Ct. App. 2009); *Allerton v. Burns*, 2021-Ohio-500, ¶ 16, 2021 WL 734764, at *3 (Ohio Ct. App. Feb. 23, 2021); *Robinson v. Harmon*, 157 N.E.2d 749 (Ohio Ct. App. 1958))). To the contrary, the cases cited by PNC have deemed that evidence of health issues common among the elderly, such as "a stroke suffered by [testator], his frailty, his hearing problems, and his poor eyesight[,] . . . may be sufficient to create a genuine issue of material fact regarding whether [he] was susceptible to undue influence at the time he executed the documents." *Neumeyer*, 906 N.E. at 1172. On the other hand, a health concern that does not pinpoint "any specifics establishing [] susceptibility due to the effect the [health concern] had on Decedent's decision-making ability" would not raise a genuine issue of material fact. *See Allerton*, 2021 WL 734764, at *3. Here, Plaintiffs have put forward specific concerns, including Richardson's use of medication, depression, confusion, and forgetfulness — all of which could point to susceptibility. *Cf. MacDowell v. DeCarlo*, 2007-Ohio-249, ¶ 86, 2007 WL 172123, at *15 (Ohio Ct. App. Jan. 24, 2007) (noting a medical expert's belief, "based on [the decedent's] age, health condition, and drug usage, that [she] was susceptible to influence" especially as she also suffered from depression due to pancreatic cancer); *Ayers v. Morenz-Harbinger*, 2020-Ohio-6861, ¶ 47, 2020 WL 7647954, at *7 (Ohio Ct. App. Dec. 23, 2020) (noting that "there was an issue of fact on this element" of whether the

12

testator was susceptible, because she suffered from depression).[6] Defendant does not provide any evidence to rebut the specific medical issues noted by Plaintiffs, and instead only reiterates its evidence that Richardson was strong-willed.[7] (*See* ECF No. 99 at 6). But a strong will or a stubborn character does not render one immune to health issues or to their effects.

As such, there is a genuine issue of material fact as to whether Richardson was a susceptible testator.

### 2. *Opportunity to Influence*

The second prong of the "undue influence" test is whether someone (or some organization) had an opportunity to influence the testator. Defendant, in asking for summary judgment, points to the fact that the 2016 Amendment was made only after Richardson had reviewed the drafted changes with an attorney, asked questions about the changes, and walked through the provisions a second time right before signing. (*See* ECF No. 93 at 13 (internal citations omitted)). But though the participation of an attorney in drafting changes to a will does provide a presumption of regularity to the execution of the will, PNC has not provided case law applying that presumption to the undue influence analysis under Ohio law — or to the opportunity to influence prong specifically. (*See id.* at 11 (citing *Estate of Snell v. Kilburn*, 165 Ohio. App. 3d 352, ¶ 30, 2005-Ohio-7076, 846 N.E.2d 572, 578 (Ohio Ct. App. 2005))).

In evaluating whether there was an opportunity to influence, courts often look to the alleged wrongdoer's access to the testator, and whether that access was to the exclusion of

---

[6] Defendant is correct in noting that the cases it cites granted summary judgment on the ultimate question of undue influence. Many of them, however, found a genuine dispute on the fact-specific first prong of susceptibility, which is at issue here.

[7] The admissibility of the medical records is addressed earlier. *See supra* Part I.A.2 n.2. Additionally, Defendant suggests that Plaintiffs fail to cite to any evidence that Richardson was "weak or feebleminded" or "easily persuadable." (ECF No. 99 at 6 (quoting *Allerton*, 2021 WL 734764, at *4)). This Court is unable to find any language in *Allerton* suggesting that that is the standard which Plaintiffs must meet for susceptibility. Notably, the portion of *Allerton* cited by Defendant is about the third prong of the undue influence test, not the first prong, which is at issue here.

others.  *See, e.g.*, *Allerton*, 2021 WL 734764, at *3.  PNC employees, specifically Mason and Riley, met with Richardson between June 8 and November 15, 2016, to discuss his investments and the 2016 Amendment.[8]  (*See* ECF NO. 97 at 19).  Because Richardson was mentally and physically unwell from early 2012 until he passed away in 2019, these meetings may have presented opportunities to unduly influence Richardson.  (*See id.* at 18).  Moreover, the meetings were conducted without any other family members present; even if the secrecy was requested by Richardson, the absence of other family members points in favor of a finding of that PNC had the opportunity to influence Richardson.  *See Allerton*, 2021 WL 734764, at *3 (finding an opportunity to influence where the alleged influencer restricted visits to the testator from family members and monitored calls); *see also Lah*, 707 N.E.2d at 174.

Neither the participation of an attorney nor the testator's purported understanding of the changes disproves the existence of an opportunity to influence the testator.  And that is what PNC's position relies on: PNC does not dispute that its employees met with Richardson or that Arnold was kept in the dark about the meetings and changes to the Trust.  Rather, PNC suggests only that any opportunities its employees had to influence Richardson were mitigated by Richardson's review of the 2016 Amendment with Burke, comprehension of Burke's explanations of the changes, and agreement that the changes were consistent with his requests. (*See id.* at 14 (citing Burke Dep. 22:18–25, ECF No. 91)).  While this may be helpful in assessing whether the changes were the result of undue influence, it does not demonstrate conclusively that PNC employees lacked opportunities to influence Richardson during their meetings in 2016.

---

[8] To the extent that Plaintiffs' argument relies on their assertion that only Burke, Riley, and Mason explained the effects of the 2016 Amendments and that "there is no evidence that Jack Richardson understood or appreciated the impact of the 2016 Amendments" (*see id.*), it is not Richardson's understanding (or lack thereof) that would demonstrate an opportunity to exert influence.

14

In summary, PNC has not shown that there is no genuine dispute of material fact of the second prong of the undue influence test.

### 3. Actual Exertion of Undue Influence

A successful claim of undue influence must demonstrate not only that there was an opportunity to influence, but also that there was actual or attempted imposition of improper influence. As Plaintiffs note, actual or attempted exertion of undue influence can be demonstrated through circumstantial evidence and inference, *see Simon*, 165 N.E.3d at 722, but the evidence presented must be more than just the "'hunch' or personal feelings" of a jilted beneficiary. *See Foelsch v. Farson*, 2020-Ohio-1259, ¶ 28, 153 N.E.3d 601, 609 (Ohio Ct. App. 2020) (affirming a finding of no undue influence where contestant of will "presented no evidence of any control" exerted over the testator). Thus, Ohio courts have found summary judgment against will contestants warranted where they could only adduce evidence of an opportunity or motive to influence, without any evidence of actual exertion of influence. *See Golub v. Golub*, 2012-Ohio-2509, ¶¶ 20–28, 2012 WL 2047734, at *4 (Ohio Ct. App. June 7, 2012). Conversely, courts have found that undue influence was actually exerted based on direct evidence of specific actions that, in combination, implied the existence of a scheme to influence. *See Simon*, 165 N.E.3d at 719–23.

Here, Plaintiffs have not put forward evidence, circumstantial or other, demonstrating a genuine dispute that PNC actually exerted, or attempted to exert, undue influence on Richardson. Instead, the evidence cited by Plaintiffs only goes to show that PNC employees might have had a motive to exert influence. For example, Plaintiffs cite to the Hicks email, in which Riley was asked how she planned to retain the assets of "$3+" clients, such as Richardson, after the clients passed away. (*See* ECF No. 97 at 20–21). This email demonstrates, from Plaintiffs' perspective,

15

"PNC Bank's willingness to elevate its own interests above the interests of the Richardsons." (*Id.*). Similarly, Plaintiffs suggest that Mason and Riley's questions to Richardson about his assets held at other financial institutions also demonstrate their desire to maintain, or even increase, the assets held at PNC after his death. (*See id.* at 20–21). But, as Defendant notes, "an interest or motive to [exercise undue influence] is not sufficient, but such influence must actually be exerted on the mind of the testator with respect to the execution of the will in question." *West*, 184 N.E.2d at 202; *see also Golub*, 2012 WL 2047734, at *4. In other words, the evidence presented by Plaintiffs of PNC's motive is not sufficient to establish the third prong.

In response to Defendant's evidence, which consists primarily of testimony that Richardson consulted with Burke before amending the Trust and requested the changes embodied in the 2016 Amendment (*see* ECF No. 93 at 15–16),[9] Plaintiffs suggest that the PNC employees' testimony should be disregarded as self-serving and that Richardson did not understand the Trust revisions drafted by Burke. (*See* ECF No. 97 at 20). Of course, where both parties have provided conflicting evidence, such as testimony disagreeing on whether Richardson wanted to make certain changes to his Trust, this Court will certainly view the evidence in the light most favorable to the nonmoving party. *See Sierra Brokerage Servs.*, 712 F.3d at 327 (citing *Tysinger*, 463 F.3d at 572)). Here, Plaintiffs have not produced any evidence contradicting Mason and Riley's testimony that Richardson asked that they facilitate revisions to the Trust on June 8, 2016. Nor have Plaintiffs produced evidence tending to show that Richardson had expressed desires that conflicted with Mason and Riley's representations, such as a desire to keep the 2011 Amendment in place, around the same time or afterward. *See infra*

_____

[9] As Plaintiffs do not raise the issue of alcohol-impairment, this Court sets aside Defendant's arguments on that issue. (*See* ECF No. 93 at 15).

Part III.A.4.; *cf. Simon*, 165 N.E.2d at 721–22. The fact that the 2016 Amendment was markedly different from the 2011 Amendment does not alter this conclusion; after all, Richardson could easily have changed his mind in the intervening five years. And without evidence disputing the PNC employees' testimony that the 2016 Amendment requested by Richardson, rather than imposed by Riley and Mason, there are no inferences for this Court to draw in favor of the non-movant on this issue.

Similarly, Plaintiffs' attempts to point out a genuine dispute about Richardson's capacity to understand the 2016 Amendment fall short. Whereas PNC cites to Burke's testimony that he walked through the revisions with Richardson twice and that Richardson understood the changes and confirmed that they adhered to his wishes,[10] Plaintiffs simply conclude that "as set forth above, there is strong circumstantial evidence that Jack Richardson did not understand, comprehend, or appreciate what the 2016 Amendments were doing to Darcy Arnold and his granddaughters" without specifying what previous information or evidence is referenced. (ECF No. 97 at 20). In the absence of guidance, this Court presumes that the previously-discussed health problems and the complexity of the 2016 Amendment are incorporated here by reference. (*See id.* at 12–15, 19–20).

_____

[10] Plaintiffs argue that Burke's testimony should not be credited, because he was actually acting on behalf of PNC, not Richardson. (*See* ECF No. 97 at 19 (referring to "PNC attorney Burke"). *But see* Burke Dep. 38:5–18, ECF No. 91 (stating that "my client was Jack Richardson and I do what's in the best interest of Jack Richardson")). Plaintiffs also argue that Burke's meetings with Richardson about the 2016 Amendment represent opportunities that PNC had to exert influence over Richardson. (*Id.* at 18–19). Although Burke had previously represented clients of PNC and had represented PNC itself in probate matters where PNC served as the fiduciary of estates of Burke's clients (after the clients had passed away), Plaintiffs have not cited any authorities holding that Burke's representation of PNC in those circumstances was unusual or provided any evidence indicating that Burke was working on behalf of PNC at the time he drafted the 2016 Amendment. Nor have Plaintiffs identified a previous conflict between Richardson and Burke; despite their assertions that Richardson "fired" Burke, the evidence does not demonstrate termination rooted in performance or personal issues. In fact, PNC suggests that it was Richardson who requested and reached out to Burke to draft the 2016 Amendment.

But just as testimony that Richardson was strong-willed and stubborn does not indicate that his health issues could not render him susceptible to undue influence, *see supra* Part III.A.1, the reverse is true here: evidence of health issues demonstrates only that he was infirm at times, but not that he lacked all capacity to understand the 2016 Amendment. Occasional moments of forgetfulness or confusion, or gastrointestinal issues, are not indicative of a total loss of cognitive ability or probative of whether someone can comprehend a concept. In fact, the evidence produced by Plaintiffs demonstrate that the opposite is true. Arnold acknowledged, for example, that her father was fully able to recognize her and his son-in-law, granddaughters, and great-grandchildren even just a few days before he passed away in 2019. (Arnold Dep. 19:7–22:8, ECF No. 88). The medical records by Plaintiffs indicate *inter alia* that Richardson "denie[d] having difficulty with concentration . . . [or] any difficulty with attention" in 2015 and often responded well to treatment. (Ex. R, ECF No. 97-18 at 3; *see* Ex. N, ECF No. 97-14). Nowhere in the evidence is there an indication that Richardson's health issues were so severe and so constant as to impair his ability to understand the 2016 Amendment at any point — or, in other words, to dispute explicit testimony that he *did* understand the 2016 Amendment.

Ultimately, Plaintiffs have not presented sufficient evidence that undue influence was actually exerted. Consider, for the sake of comparison, the circumstantial evidence presented in *Simon*. There, the contestor of the will, Simon, showed *inter alia* that: (1) her sister, Aulino, claimed to be unaware of changes that their father had made with Aulino present; (2) Aulino had daily conversations with Simon's ex-husband for three months immediately after their divorce and the ex-husband then told Simon and Aulino's father that Simon had cheated on him, was addicted to painkillers, and had lied about having cancer; (3) the father subsequently changed various aspects of his estate to cut out Simon; (4) once the changes were made, Aulino stopped

18

calling her sister's ex-husband; and (5) there was clear evidence from multiple third parties that the father did not want to disinherit Simon. *Simon*, 165 N.E.3d at 719–21. In short, the plaintiff in that case put forward direct evidence of specific actions with clear causal links that combined to create a circumstantial picture of actual exertion of influence. Other courts have suggested that the actual exertion of undue influence may be shown testimony or exhibits "tending to show that [the testator] was coerced either by threats or solicitations or by mercenary kindness or attentions." *Lah*, 707 N.E.2d at 174. But no corresponding evidence exists here: Plaintiffs have not demonstrated evidence linking PNC or its employees with concrete actions that imply influence or coercion.

Instead, Plaintiffs rely entirely on speculative leaps to support their conclusion that PNC actually exerted undue influence — that because PNC had a motive to exact undue influence, it must have done so. Although a claim of undue influence may rely on circumstantial evidence, mere speculation is insufficient. Accordingly, this Court finds that there is no genuine dispute of material fact as to whether PNC actually or attempted to exert undue influence over Richardson.

### 4. *Result Showing the Effect of Such Influence*

Nor can Plaintiffs demonstrate a genuine issue of material fact that the 2016 Amendment implemented changes that are the effect of influence by PNC, and not simply the result of Richardson's own wishes. According to PNC, the 2016 Amendment simply embodied Richardson's concerns about Arnold's liberal spending habits and his desire that the Trust provide Arnold and her daughters with sufficient funds during their retirements. (ECF Nos. 93 at 19–21; 99 at 16). Thus, placing disbursement power in the hands of a third-party trustee and delaying the mandatory distributions until retirement age were simply mechanisms for ensuring that the assets in the Trust were not depleted too quickly by profligate spending and were

19

available as Richardson's daughter and granddaughters reached retirement age. *Cf. Medicare Benefits*, Soc. Sec. Admin., https://www.ssa.gov/benefits/medicare/ (explaining that Medicare provides health insurance to people age 65 or older). And the removal of Arnold as trustee, according to PNC, was in accord with Richardson's growing distrust of, and unhappiness with Arnold, due to her unilateral decision to give herself a power of attorney for Betty. (*See* ECF No. 93 at 19–21). In support of its argument, PNC notes the testimony of various individuals, including its own employees, who reported that Richardson had concerns about the way "future generations" spent money. (*Id.* at 19–20).

Plaintiffs raise various arguments in dispute of the conclusion that the 2016 Amendment reflected Richardson's desires.[11] (*See* ECF No. 97 at 24). The arguments do not, however, address the evidence produced by Defendant PNC. First, Plaintiffs suggest that the fact that the 2016 Amendment is "markedly different" and "the one and only time in the Richardsons' estate planning that every change was for the benefit of a single entity" is enough on its own to "lead to a conclusion and finding of undue influence." (ECF No. 97 at 30). That is simply not the case: changes to a will, even drastic changes, do not state a claim for undue influence on their own. To the contrary, "[t]he fact that the will of the testator . . . disposes of his property in an unnatural manner, unjustly, or unequally, and however much at variance with expressions by the testator concerning relatives or the natural objects of his bounty, does not invalidate the will, unless undue influence was actually exercised on the testator." *West*, 184 N.E.2d at 202 (quoting 95 C.J.S. *Wills* § 224). Instead, to satisfy this prong of the undue influence test, Plaintiffs must

---

[11] Plaintiffs also argue that this case "highlights precisely why those who are unscrupulous in dealing with end-of-life modifications to estate plans zealously hide their actions until after the death of the testator" and note their pending motion seeking evidence about other PNC clients. (ECF No. 97 at 21–22). Setting aside the merits of this assertion, this Court notes that the deadline for discovery passed nearly six months ago. (*See* ECF Nos. 69, 98). And as Plaintiffs have not produced any evidence regarding the "zealous" hiding of actions, this Court disregards that portion of Plaintiffs' arguments.

show not only that the Trust was altered, but also that the alterations were a result of undue influence — in other words, that the changes in the 2016 Amendment were the result of PNC's ploy, and not Richardson's own desires. *Cf. Simon*, 165 N.E.3d at 721 (noting abundant evidence that the contested will disinheriting daughter did not reflect father's desires, including multiple third-party witnesses, text messages, and birthday cards from the father).

Next, Plaintiffs dispute PNC's characterization of Richardson's intent, noting that he expressed concerns only about Arnold living beyond her means, and not about his granddaughters doing so too. (*See* ECF No. 97 at 23). It is true that the deposition testimony cited by PNC does not conclusively demonstrate Richardson expressing the same misgivings about his granddaughters' spending habits. Mason, for example, notes only that Richardson "felt that Darcy lived beyond her means," and does not mention DeNoble or Pennington. (*See* Mason Dep. 94:8–12, ECF No. 90). Donatelli's comments, as Plaintiffs noted, are drawn from his recollections of Richardson from the early 1990s; it is difficult to draw conclusions about Richardson's granddaughters' spending habits as adults from that testimony. (*See* Deposition of Robert Donatelli ("Donatelli Dep.") 47:23–48:6, ECF No. 92). Finally, Riley noted that Richardson was worried that "they lived outside their means," but it is unclear if "they" referred to Arnold and her husband or to Arnold and her daughters.[12] (*See* Riley Dep. 42:1–43:6, ECF No. 89). Although PNC's mischaracterization somewhat undermines Richardson's purported rationale for delaying the mandatory distributions to DeNoble and Pennington, it does not leave the 2016 Amendment without any basis; after all, delaying the distributions until DeNoble and Pennington turn 60 still aligns with Richardson's stated intent to provide for their retirements,

---

[12] Riley refers to Arnold and the granddaughters preceding this quote, but there is an interruption by counsel. Moments before, Riley had reported that Richardson "said to Kim and I, I could be wrong, but I believe that Darcy and Jim live outside of their means." (*See* Riley Dep. 41:24–42:2, ECF No. 89).

which Plaintiffs do not dispute. (*See id.* at 23). Nor do Plaintiffs provide evidence disputing PNC's assertion that Richardson had concerns about Arnold's spending habits,[13] and thus may have had valid reasons to limit the mandatory distributions in the trust. (*See id.* at 23).

Finally, Plaintiffs maintain that, even if PNC correctly characterized Richardson's intent, the 2016 Amendment does not align with that intent because Arnold has been retired for three years and has not received any money from the Trust. Instead, if Richardson truly wanted to provide for Darcy's retirement, Plaintiffs suggest that he would have either made no changes to the Trust at all, since Darcy was already nearing retirement age in 2016, or implemented a different set of changes that would have ensured that she receive distributions in the first few years of her retirement. (*Id.* at 24). This argument appears to be at the core of Plaintiffs' undue influence claim: the fact that, in the years since Richardson passed, the Trust has not provided any distributions to Plaintiffs. (*See also id.* at 19 (arguing that Richardson did not understand the 2016 Amendment because he would not have wanted to set up his estate such that "his only daughter and granddaughters have yet to receive anything" three years after his death)).

But this argument conflates distinct claims. According to Plaintiffs' theory, the 2016 Amendment is the "result" that shows the effect of the alleged undue influence. But the 2016 Amendment explicitly requires quarterly mandatory distributions to Arnold starting at age 65, which would align both with PNC's characterization of Richardson's intent (i.e., that the Trust allow Arnold to be comfortable in retirement) and also with Plaintiffs' version of Richardson's intent (i.e., that he would have wanted Arnold to receive distributions since 2019); after all, it did

---

[13] Plaintiffs suggest that Mason and Riley's testimony should be discredited because both are biased. (*See* ECF No. 97 at 23). But, as before, Plaintiffs have not provided any evidence disputing Mason and Riley's testimony for this Court to weigh. Plaintiffs also argue that "Jack never definitively said that Darcy lived beyond her means." (ECF No. 97 at 23). The quoted testimony from Riley recalls Richardson saying: "I believe that Darcy and Jim live outside of their means." (*Id.* at 23 (quoting Riley Dep. 41:21–42:9, ECF No. 89)). Plaintiffs' objection, in other words, is a quibble about semantics, not a serious dispute of the substance of the statement.

not eliminate distributions to Arnold, DeNoble, or Pennington from the Trust altogether.  *Cf.*

*Simon*, 165 N.E.3d at 711.  Instead, the true reason that Arnold has not received any distributions

is because of how the Trustee has executed the Trust provisions (or, rather, how the Trustee has

failed to execute the provisions mandating income distributions).  That may raise a breach of

trust claim,[14] but does not speak to Richardson's intent in enacting the 2016 Amendment.  After

all, courts evaluate a testator's intent by looking to the circumstances and contemplations at the

time the will (or trust amendments) was made, *see, e.g.*, *Bank One Ohio Trust Co., N.A. v. Hiram*

*Coll.*, 115 Ohio App. 3d 159, 161 (Ohio Ct. App. 1996), not "by what occurred long after the

execution of his will."  *Id.*  Plaintiffs' evidence that PNC has not issued distributions in line with

the Trust mandates after 2019 does not, in other words, create a genuine dispute of material fact

about Richardson's intent in changing the Trust in 2016.

* * *

In summary, there is no genuine dispute that Plaintiffs have failed to put forward clear

and convincing evidence showing that PNC "so overpower[ed] and subjugate[d] the mind of the

testator as to destroy his free agency and make him express the will of another rather than his

own."  *West*, 184 N.E.2d at 202.  Accordingly, Defendant's Motion for Summary Judgment is

**GRANTED** as to Plaintiffs' undue influence claim.

### B.        Declaratory Judgment Claims

#### 1.        Validity of the 2016 Amendment

In Count One of the Second Amended Complaint, Plaintiffs requested a declaratory

judgment that the 2016 Amendment was invalid, void, and of no force or effect because the

changes were the result of undue influence or because Richardson lacked testamentary capacity.

---

[14] This is discussed further below.  *See infra* Part III.B.2.

23

(*See* ECF No. 56 ¶¶ 54–60). As there is no genuine issue of material fact regarding the undue influence claim, *see supra* Part III.A, this Court focuses its analysis here on the question of testamentary capacity. The test for testamentary capacity is whether the testator had sufficient mind and memory to "[(1)] to understand the nature of the business in which he is engaged; [(2)] to comprehend generally the nature and extent of his property; [(3)] to hold in his mind the names and identity of those who have natural claims upon his bounty; [and (4)] to be able to appreciate his relation to the members of his family." *In re Ludwick*, 1999 WL 391092, at *3 (Ohio Ct. App. May 24, 1999) (citing *Niemes v. Niemes*, 119 N.E. 503, syllabus ¶ 4 (Ohio 1917)). As a threshold matter, Plaintiffs again appear to misunderstand the standard of review, asserting that PNC has flipped the summary judgment standard by "arguing that Plaintiffs cannot present any facts to support their claim." (ECF No. 97 at 25). But that is exactly what PNC is asked to do at summary judgment: to argue and demonstrate that Plaintiffs are unable to present sufficient evidence in support of their claim to meet the burden of proof and that, therefore, there is no genuine issue of material fact. And it is incumbent on Plaintiffs, as the non-movant, to present sufficient facts in support of their claims to demonstrate the existence of a genuine issue of material fact.

Plaintiffs have not done so here. PNC argues that Richardson satisfied all four elements of the test for testamentary capacity. (*See* ECF No. 93 at 23). He understood the nature of the changes, according to Burke's testimony; he knew the extent of his assets; he remembered his daughter, granddaughters, and great-grandchildren, even if he occasionally mixed up their names, and the nature of his relationships to them, according to Arnold's testimony. (*See id.* at 23–24). Plaintiffs dispute how much weight this Court should give to Arnold's lack of personal knowledge as to whether Richardson understood the 2016 Amendment. (*See* ECF No. 97 at 25–

24

26).  That point is well-taken: just because Arnold did not have personal knowledge that Richardson did not understand the changes does not mean that there is no such evidence supporting a lack of understanding.

The problem for Plaintiffs, however, is that the dispute about the value of Arnold's testimony is the entirety of their argument: they have not affirmatively provided any evidence tending to show that Richardson did not understand the 2016 Amendment.  (*See generally id.*).  Nor do Plaintiffs explain how the health issues, which were identified in their arguments about the undue influence claim,[15] affected Richardson's ability to understand the changes to the Trust; generalized claims of occasional forgetfulness or depressions do little to undermine Burke's testimony that Richardson understood and approved the 2016 Amendment.  *See supra* Part III.A.3.

In the absence of evidence creating a genuine dispute of material fact, this Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 93) on Count I of Plaintiffs' Second Amended Complaint (ECF No. 56).

### 2. *"Just Cause" for Removal*

In its counterclaim, PNC asks this Court for a declaratory judgment that Plaintiffs lacked "just cause" for removing PNC as trustee.  Under § 7.4(b) of the Trust agreement, beneficiaries of the Trust are authorized to remove the bank or trust company serving as Trustee "for just cause only," and "any Trustee so removed [is authorized] to bring an action in a court of competent jurisdiction to review the beneficiary's act."  (ECF No. 56-5 at 12).  Plaintiffs, who are beneficiaries of the Trust, delivered a removal letter to PNC on July 14, 2021.  (*See* ECF No.

---

[15] Plaintiffs do not cite to or mention the health issues discussed in the undue difference claim, but this Court presumes that that is their intent in referencing "the evidence set forth above" without any further specificity.

56-6).  In Plaintiffs' removal letter, they raise several reasons for taking action: (1) conflict of interest; (2) incurable breakdown in communications; (3) failure to make distributions; (4) failure to prepare and to submit tax documents timely; (5) failure to transfer the Florida condo; and (6) poor investment returns.  (*See* ECF No. 56-6).

Under Ohio law, "just cause" for removal includes cases where: "(1) The trustee has committed a serious breach of trust; (2) Lack of cooperation among cotrustees substantially impairs the administration of the trust; [and] (3) Because of unfitness, unwillingness or persistent failure of the trustee to administer the trust effectively, the court determines the removal of the trustee best serves the interests of the beneficiaries."  Ohio Rev. Code § 5807.06(B).  Defendant notes, as an initial matter, that the second category only applies to cases of friction between co-trustees and not to cases of friction between trustee and beneficiary, and is therefore inapplicable here.  (*See* ECF No. 93 at 30–31).  Defendant also argues that poor investment returns for a year or two are insufficient to constitute "persistent failure of the trustee to administer the trust effectively."  (*See* ECF No. 93 at 32 (citing Ohio Rev. Code § 5807.06; *Bartlett v. Betlach*, 146 P.3d 1235 (Wash. App. 2006)).  Both points are well-taken; therefore, this Court focuses its analysis on whether the first, third, fourth, and fifth reasons for removal identified in Plaintiffs' letter constituted a "serious breach of trust."  *See* Ohio Rev. Code § 5807.06(B).

A breach of trust claim arises from any "violation by a trustee of a duty the trustee owes to a beneficiary," *id.* § 5810.01, which includes trust requirements regarding the distribution of income.  *See, e.g.*, *Gorby v. Aberth*, 2017-Ohio-274, ¶ 16, 81 N.E.3d 910, 915 (Ohio Ct. App. 2017).  It is undisputed here that the 2016 Amendment mandated the Trustee provide quarterly income distributions to Arnold after she turned 65, which Plaintiffs allege PNC has not.  (*See* ECF Nos. 56-5 at 4; 56-6 at 3; 97-5 ¶ 3).  It is also undisputed that the Trustee is required to

26

transfer the Florida condo to Arnold, which Plaintiffs also allege that PNC has not done.  (*See* ECF Nos. 56-5 at 2–3; 56-6 at 3).  PNC labels both oversights "minor" in its Motion for Summary Judgment (*see* ECF No. 97 at 31), but does not explain why an apparent failure to fulfill its explicit trustee obligations should be considered minor, nor provide any evidence explaining why its inaction is justified.

As a reasonable jury could disagree on whether Plaintiffs had "just cause" for the removal of PNC as trustee, Defendant's Motion for Summary Judgment (ECF No. 97) on its counterclaim for declaratory judgment is **DENIED**.  Additionally, Plaintiff's Seventh Cause of Action is for breach of trust agreement.  (*See* ECF No. 56 ¶¶ 112–118).  As the foregoing "just cause" analysis looked to whether Defendant had committed a serious breach of trust and found that there were genuine issues of material fact on that question, Defendant's Motion for Summary Judgment (ECF No. 97) on Plaintiffs' breach of trust claim is also **DENIED**.

### C.    Tort Claims

In the Second Amended Complaint, Plaintiffs present two tort claims against PNC Bank: tortious interference with expected inheritance and breach of fiduciary duty.

#### *1.    Tortious Interference with Expected Inheritance*

Under Ohio law, the "elements of intentional interference with an expectancy of inheritance are: (1) the plaintiff's expectancy of an inheritance; (2) the defendant's intentional interference with that expectancy of inheritance; (3) conduct by the defendant involving the interference that is tortious in nature, such as fraud, duress or undue influence; (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the defendant's interference; and (5) damage resulting from the interference."  *Mackay v. Thomas*, 2018-Ohio-4154, ¶ 26, 121 N.E.3d 814, 818 (Ohio Ct. App. 2018) (citing *Firestone v. Galbreath*, 67 Ohio

27

St.3d 87, 88 (1993)). The parties appear to agree that Plaintiffs had an expectancy of inheritance, as established by the 2011 Amendment. The parties also agree that the 2016 Amendment changed the structure, amount, and timeframe of Plaintiffs' inheritance. (*See* ECF No. 97 at 27).

The key disagreement between the parties is whether there exists a genuine dispute about the third element of a tortious interference claim. PNC asserts that it "acted only in furtherance of Richardson's expressed interests and desires" and did not exert undue influence.[16] (ECF Nos. 93 at 26; 97 at 27–28). Plaintiffs counter that PNC "targeted the Richardsons in June 2016 as clients whose money PNC Bank sought to 'retain'" and that "Darcy has not yet received a single distribution under the 2016 Amendments." (*See* ECF No. 97 at 27–28). These arguments, however, are insufficient to establish undue influence, as noted previously: (1) a motive does not, on its own, prove undue influence, *see West*, 184 N.E.2d at 202; and (2) after-the-fact distributions (or lack thereof) do not speak to the intent of the testator, let alone to whether influence was exerted. And Plaintiffs have not even demonstrated that influence was exerted at all: the mere fact that the Trust was revised in 2016 is insufficient, contrary to Plaintiffs' assertion.[17] (*See* ECF No. 97 at 27).

Plaintiffs have not done adduced evidence, direct or circumstantial, that PNC "overpower[ed] and subjugat[ed] the mind of the testator," *West*, 184 N.E.2d at 202, and thus have not established a genuine issue of material fact on the third element of their expectancy of inheritance claim. Accordingly, this Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiffs' tortious interference claim.

---

[16] Of course, Plaintiffs may also satisfy the undue influence elements by demonstrating that the 2016 Amendment was made under duress or was fraudulent, but Plaintiffs do not appear to allege any other tortious conduct besides undue influence. (*See* ECF Nos. 93 at 26; 97 at 27).

[17] It appears that Plaintiffs imply that any major change in an estate entails interference. This Court may have misunderstood Plaintiffs' briefing, but the alternative reading of the same passage suggests that Plaintiffs conclude PNC "is simply wrong" without any supporting citations or explanations. (*See* ECF No. 97 at 27).

2. *Breach of Fiduciary Duty*

To prove a breach of fiduciary duty, a plaintiff must show: "(1) the existence of a duty from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Akerstrom v. 635 W. Lakeside, Ltd.*, 2018-Ohio-98, ¶ 18, 105 N.E.3d 440, 446 (Ohio Ct. App. 2018) (citing *Lombardo v. Mahoney*, 2009-Ohio-5826, ¶¶ 18–19, 2009 WL 3649997, at *4 (Ohio Ct. App. Nov. 5, 2009)). It appears that Plaintiffs allege the following actions by PNC and its employees breached their fiduciary duties to Richardson: (1) suing Betty Richardson in probate court; (2) failing to disclose conflicts of interest, potential conflicts of interest, and a right to independent counsel; (3) targeting the Richardsons; (4) succeeding in influencing the Richardsons to move their non-PNC-held assets into PNC's control; and (5) persuading Richardson to enact the 2016 Amendment.[18] (*See* ECF No. 97 at 28–29).

Although Defendant is correct in stating that "Plaintiffs fail to provide any analysis in their Opposition of how they satisfy [the] elements" of a breach of fiduciary duty claim (ECF No. 99 at 21 n.5), it is also the case that Defendant has provided little analysis of how its actions do not satisfy the elements of a breach of fiduciary claim. Plaintiffs' tort claims may be rooted in their undue influence claim, but they have also identified specific actions of PNC employees, distinct from the overarching undue influence claim, that allegedly breached PNC's fiduciary duty to the Richardsons. For example, Plaintiffs are not required to succeed on their undue influence cause of action as a prerequisite for claiming that PNC's efforts to convince Richardson to transfer assets held outside of PNC into his PNC account breached its fiduciary duty. (*Cf.* ECF No. 99 at 21 (arguing that "because Plaintiffs' undue influence claim undeniably

[18] Plaintiffs list a number of facts that are "undisputed," before then discussing breaches. (*See* ECF No. 97 at 28). As it is unclear whether the "undisputed" events are also intended to constitute alleged breaches of fiduciary duty, this Court has included them for the sake of completeness.

29

fails . . . so too must Plaintiffs' bootstrapped tort claims fail")). And, as the party moving for summary judgment, PNC bears the burden of demonstrating that there does not exist a genuine issue of material fact with respect to the specific breaches alleged by Plaintiffs.

Accordingly, Defendant's Motion for Summary Judgment (ECF No. 93) is **DENIED** as to Plaintiffs' breach of fiduciary duty claim.

### D.     Other Claims

#### 1.     Breach of Contract

Plaintiffs' Fifth Cause of Action is for breach of contract (*see* ECF No. 56 ¶¶ 101–08), which, under Ohio law, requires establishing "by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Quest Workforce Sols., LLC v. Job1USA, Inc.*, 2016-Ohio-8380, ¶ 40, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016) (citing *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App. 3d 230, ¶ 77, 2007-Ohio-4606, 877 N.E.2d 1041, 1052 (Ohio Ct. App. 2007)). Defendant suggests that "there is no evidence of a contract between PNC and Richardson (nor any contract between PNC and Plaintiffs)," and thus that not even the threshold element of a breach of contract claim has been met. (ECF No. 93 at 28). In response, Plaintiffs do not provide any evidence that a contract exists. (*See generally* ECF No. 97 at 29). Instead, Plaintiffs argue that:

> [A]s PNC Bank moved for summary judgment, PNC Bank had the opportunity to present legal argument regarding whether there is a contract. Instead, PNC Bank concluded that, in its view, there is no evidence of a contract, so none exists. In doing so, PNC failed to address whether the features of a valid contract exist, and has thus waived the right to do so.

(*Id.*). Plaintiffs appear to misunderstand what is required of them at this stage of the litigation: as PNC has moved for summary judgment and argued that there is no evidence of any contract at

all (let alone any features of a valid contract), Plaintiffs now carry the burden of providing evidence that, at the least, tends to show that such a contract exists. It is unclear what evidence Plaintiffs believe Defendant must point to regarding the non-existence of a contract, since the very basis of Defendant's argument is that the record does not contain any evidence of a contract. As noted previously, this Court cannot construe evidence in favor of the non-movant (here, in favor of Plaintiffs), if the non-movant does not provide any evidence to construe.

In the absence of any evidence suggesting the existence of a contract, and thus any evidence disputing PNC's claim that no contract exists, this Court finds that PNC is entitled to summary judgment as a matter of law on the breach of contract claim.

### 2.    Accounting

The Sixth Cause of Action "requests that PNC provide a full accounting of the Trust." (ECF No. 56 ¶ 111). PNC suggests that this request is unnecessary, because the Trust already requires an annual accounting, without the need for an extraneous, court-ordered accounting. (*See* ECF No. 93 at 29 ("Section 8.6 of the Trust says, 'The Trustee (if other than myself or my wife) shall render an account of trust receipts and disbursements and a statement of assets, at least annually, to each person then entitled to receive distributions from the trust.'" (citing ECF No. 56-5 at 15))). But according to Plaintiffs, "it is undisputed that PNC Bank has never rendered an accounting under the Trust. . . . [and] has failed to provide and/or identify any accounting of the Trust to Plaintiffs since PNC Bank took over as Trustee in 2019." (*See* ECF No. 97 at 30). And, though Plaintiffs do not specify the basis for their equitable accounting claim, they do provide sufficient facts — including allegations of necessity, given PNC's refusal to adhere to the accounting schedule in the Trust, and trust/fiduciary relationship — to sustain an accounting claim in light of the inadequacy of other legal remedies. *See Sabre Energy Corp. v.*

31

*Gulfport Energy Corp.*, 2021 WL 2779157, at *4 (S.D. Ohio July 2, 2021); *cf. Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 2007 WL 1144866, at *4 (S.D. Ohio Apr. 16, 2007) (noting that legal bases for an accounting claim include *inter alia* fraud, fiduciary or trust relationship, necessity, mutual accounts, or circumstances of great complication).  Although the Sixth Circuit has noted that "in light of the broad discovery available to litigants, accounting actions are of dubious utility," *Digital 2000, Inc. v. Bear Commc'ns*, 130 F. App'x 12 at *23 (6th Cir. 2005), the benefits of discovery are unavailable here, where PNC has rejected Plaintiffs' discovery requests for an accounting.

Accordingly, this Court finds that there are genuine issues of material fact as to Plaintiffs' accounting claim and therefore **DENIES** Defendant's Motion for Summary Judgment (ECF No. 93) as to that claim.

## IV.    CONCLUSION

For the reasons set forth above, this Court **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Summary Judgment (ECF No. 93).  Plaintiffs' declaratory judgment, undue influence, tortious interference, and breach of contract (Counts I–III, V) are **DISMISSED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  December 27, 2022**